IN THE MATTER OF THE SWORN APPLICATION OF MRS.
WILLIAM G. WELLHOFER AND OTHER FREEHOLDERS
OF THE CITY OF ATLANTIC CITY, IN THE COUNTY OF
ATLANTIC, FOR A SUMMARY INVESTIGATION INTO
THE MUNICIPAL EXPENDITURES OF SAID CITY.

Argued April 21, 1948—Decided May 19, 1948.

For the applicants, *Thomas D. Taggart, Jr.*

For the City of Atlantic City, *William Elmer Brown, Jr.*

EASTWOOD, J. On April 2d, 1948, a rule to show cause
was made, upon the application of thirty-four freeholders,
why a summary investigation of the affairs of the City of
Atlantic City, pursuant to the provisions of *R. S.* 40:6–1,

*et seq:*, should not be directed. On April 21st and 22d, 1948, counsel for the city presented voluminous affidavits in answer to those presented by applicants. Subsequently,. I allowed further time for counsel to obtain and submit additional affidavits and briefs. The proofs and briefs of the parties have been given careful and thorough consideration.

A concise statement and recital of the grievances alleged by the applicants will serve to clarify the conclusions herein expressed. Applicants assert seventeen specific grounds claimed to merit such action. I deem it essential, for the determination of this issue, to discuss only the following:

1. That the City Commissioners on May 8th, 1947, while one Stanley Adams was serving as a member of the January term Atlantic County grand jury then investigating various criminal charges against City Commissioner Albert N. Shahadi, passed a resolution awarding a contract without advertisement to his firm, L. C. Adams & Sons in the amount of $11,231 for the rebuilding of life guard stands, boxes and other beach equipment exclusive of life boats, in violation of *R. S.* 40:50–1. It is claimed that the contract in question was awarded pursuant to an emergency resolution adopted by the City Commissioners on May 8th, 1947, and that all the circumstances and reasons for the emergency action have been fully disclosed. Albeit advertisement may not be required if an emergency exists, still it seems from a consideration of the facts and circumstances presented by the applicants that an investigation of the alleged improper action might well warrant such an investigation, when it is borne in mind that the underlying motive for the award of the contract might prompt any reasonable person to inquire whether such award was in any way connected with the presence of Stanley Adams, a member of the firm obtaining the contract, on the grand jury then engaged in investigating charges against Commissioner Shahadi.

2. That the City of Atlantic City advertised for bids for the construction of a comfort station at Kentucky Avenue and Bacharach Boulevard, and thereafter on March 11th, 1948, the governing body awarded the general construction

contract to the Masset Building Company, knowing that one Robert Watson, a city employee, had a direct or indirect interest therein, in violation of *R. S.* 40:73-2. The city argues that Watson was not an employee; that he was an independent contractor, occupying an office or position as a consultant on Veterans' Housing. Be that as it may, it seems logical to inquire whether an investigation might not be the proper means of ascertaining the truth of the allegations advanced by the respective parties. Although the bid of Masset Building Company was the low bid, still it remains to inquire whether or not any fraud existed. It is not the function of this application to decide those questions.

3. That during the year of 1947, the governing body authorized the execution of a contract to pay the sum of $5.000 to the Northside Board of Trade (a private association), allegedly for the publicizing of Atlantic City, knowing that at the time of the award one C. J. Newsome, who was employed as a special investigator by the City of Atlantic City, had an interest in the award of the contract, and that said C. J. Newsome received for his personal use a portion of said moneys paid over by the City to said Northside Board of Trade, in violation of *R. S.* 40:73-2; also, that said payment violated *R. S.* 40:5-1, requiring sworn, itemization of expenditures, which was not furnished. It is said that there is no clear proof evidencing such alleged interest of Newsome, and further that a mere employee of such a corporation might not be said to be directly or indirectly interested in a contract made by a corporation employing him. Again, there seems reasonable cause to believe that such interest might conceivably exist, and that an investigation would be a proper means of determining the true facts, both as to Newsome's interest in said contract and alleged violation of *R. S.* 40:5-1.

4. That on August 21st, 1947, the governing body authorized the payment of $5,000 to the Atlantic City Country Club, a corporation organized for profit, in payment of services allegedly to be rendered under contract by the club in advertising the advantages of the city in connection with the club's conduct of a pro-amateur golf tournament in September of

1947, said payment constituting an illegal gift of public property to a private corporation in violation of *R. S.* 40:5–1, in that the sum of $5,000 representing the bill of the Atlantic City Country Club for such alleged services was not itemized, did not specify particularly how said bill or demand was made up, did not set forth the dates and names of the persons to whom the amounts composing said bill or demand were severally paid, and did not include the affidavit of the party claiming payment, that the bill or demand was correct. My perusal of the contract and the voucher submitted by the Country Club leads me to the conclusion that many facts and circumstances surround the transaction which might well cause a reasonable man to inquire whether or not the transaction was *bona fide* and proper. It seems to me the requested investigation will go far to answering any doubts that might exist in this respect.

5. That in August of 1947 the governing body awarded the electrical contract for the city's new airport office building located at the city's Pomona Airfield to the Garden State Construction Company, knowing that one Ernest Eger, employed by the city as chief electrician of the Convention Hall, had a direct interest in the contract and the profits thereof, in violation of *R. S.* 40:73–2. The city contends that its answering affidavits clearly disclose all the facts and circumstances with respect to the particular contract referred to by the applicants, and that, in addition, the city has given full and complete data of all other improvement projects upon which the Garden State Construction Company submitted bids. I am asked to dismiss the application on the ground that the city commissioners acted within their discretionary power and awarded the contract to the lowest responsible bidder, and further, that there is no proof of fraud or illegality. Here, too, I am of the opinion that an investigation will bring to light and place in proper focus the true situation regarding this particular transaction. See *Dallas* v. *Sea Isle City*, 84 *N. J. L.* 679; 87 *Atl. Rep.* 467.

6. That hundreds of thousands of dollars of real estate tax assets of the city have not been received, or collected, and

have been wasted and misappropriated by reason of the arbitrary abuse of governmental power by the governing body by granting improper, unjustifiable and unlawful tax interest cancellations on real estate tax indebtedness owed by certain taxpayers whom the governing body desired to favor at the expense of other taxpayers. Specifically, that the sum of $305,279 was lost and wasted and misappropriated by such tax cancellations alone on five properties known as the Breakers Hotel, the Ritz Carlton Hotel property, the Maharba Apartment, premises Nos. 14-16 South Connecticut Avenue and premises Nos. 32-34 North Albany Avenue. It is claimed that the sum of $305,279 was lost, wasted and misappropriated by such tax cancellations alone on five properties as above set forth. In answer, the city officials seek to justify the cancellations on the ground that such action represented an exercise of the best judgment of the commissioners, and that the propriety of the cancellations is sanctioned by the provisions of *R. S.* 54:4–99. However, it appears that *R. S.* 54:4–99 must be read in conjunction with *R. S.* 54:4–100 which provides that: "No abatement of the principal sum of any such taxes, assessments or other municipal charges shall be made unless the governing body shall be satisfied that the market value of the property in question upon or against which such taxes, assessments or other charges have been levied, is less than such principal sum, * * *." Counsel for the city argues that the cancellations in question represent a compromise of interest and penalties only and do not affect the principal sums due. However, the latter argument is one which it seems to me cannot be fully determined in a proceeding such as is before me, but must await further investigation and clarification. It is interesting to note that in no one of the five alleged instances of improper cancellation has the city offered any proof of market value during the year of cancellation in question. On the contrary, the applicants have offered proof that the assessed value for the year of cancellation in each instance exceeded the total of accumulated taxes. The following tabulation will aid in demonstrating the situation graphically:

| Property | Total Accumulated Taxes | Assess-ment for Year of Cancel-lation | Amount Cancelled |
|---|---|---|---|
| Breakers Hotel .. ... | $493,664.50—1945 | $521,700 | $216,841.45 |
| Ritz Carlton Hotel and Ritz Carlton Res-taurant .. ........ | 308,938.65—1944 | 783,150 | 73.314.00 |
| Maharba Apart-ment ........ . . .Tax Title Lien $—1946 | | 69,100 | 50,613.49 |
| Nos. 14-16 South Con-necticut Avenue ...Tax Title Lien $—1946 | | 21,500 | 3,514.51 |
| Nos. 32-34 North Al-bany Avenue ......Tax Title Lien $—1946 | | 6,250 | 2,859.98 |

At the hearing it was represented that Atlantic City assessments are made on a basis of full value, and that no appeals were taken from said assessments. It is my conclusion that, from the facts and circumstances alleged in the affidavits, a reasonable question is raised justifying inquiry as to whether or not the tax cancellations in question may be said to constitute an unlawful or corrupt expenditure of municipal moneys.

7. That the governing body failed to enforce the terms of a five-year lease of the city owned five-story, 200-room Astor Hotel, which specifically required in addition to a percentage rental, a minimum expenditure by the tenants of $10,000 per year for repairs, maintenance and improvements to the building and equipment, and failed to require from the tenant under the terms of the lease an annual true, accurate and detailed statement under oath of all such required expenditures, resulting in very substantial losses to the taxpayers. The city alleges that all the details of the transaction have been disclosed; that detailed reports and statements have been filed for the years 1945, 1946 and 1947; that in 1943 and 1944, no expenditures were made and no account filed, and that if such were required in 1943 and 1944, counsel for the applicants was then the Mayor of Atlantic City and should have seen that this was done. Again, I say that on the present application, it is not my province to determine the truth or falsity of the allegations made by the respective parties, but

only whether there exists grounds giving cause to believe that expenditures have been unlawfully or corruptly made. Therefore, I conclude that an investigation will serve as a proper means of bringing to light the true facts and circumstances of the transaction.

8. That over $200,000 in delinquent personal property taxes have not been received nor collected and have been wasted and misappropriated by reason of the arbitrary and illegal abuse of governmental power by the governing body when, in September of 1947, the governing body passed a resolution ordering the tax collector to make a wholesale cancellation of delinquent personal property taxes due for the years 1928 to 1946, inclusive, in violation of article 1, paragraph 20, of the New Jersey Constitution (1844), now article 8, section 3, paragraph 3, of the New Jersey Constitution (1947), which provides, in effect, that no donation of land or appropriation of money shall be made by the state or any municipal corporation to or for the use of any society, association, or corporation whatsoever. It is urged that the resolution in question was legal and justifiable under the provisions of *R. S.* 54:4–91, 91.1, 91.2 and 91.3 as well as *R. S.* 54.4–99 authorizing the governing body, on being satisfied that the taxes are uncollectible, to release the collector from the collection thereof and order the same canceled, and that past due taxes as well as interest and penalties thereon may be abated, if in the judgment of the governing body it is deemed equitable and just and to the best interests of the municipality to do so. In my opinion, the question of the proper exercise of discretion by the governing body is a circumstance that may properly be made the subject-matter of the investigation requested by applicants. Particularly is this so in light of the decision of the Court of Errors and Appeals in *Wilentz* v. *Hendrickson,* 135 *N. J. Eq.* 244; 38 *Atl. Rep.* (*2d*) 199, opinion by Mr. Justice Perskie, forbidding the legislature to remit interest on taxes which have accrued and which interest has become a valid part of the principal debt for taxes owed to the state. and in view of the fact that the written recommendation of the tax collector failed to state opposite each assessment the reason for its proposed cancellation. as required by the statute.

9. That after months of secret negotiations, held prior to the assumption of office by the present governing body, and shortly after such offices were assumed (May 18th, 1944) by the present officials, a resolution was adopted on June 2d, 1944, giving the exclusive right by private contract to Stifel, Nicolaus & Co., Inc., a Chicago brokerage firm, to purchase the entire issue of $20,433,000 of new city bonds and $1,686,000. New water bonds at a specific interest rate of 3.20 (later reduced by subsequent agreement to 3.18) to be paid by the city, the purpose of which agreement was to effectuate the issuance of new bonds by the refunding and retirement of old bonds, and thereby obtain, under the new bonds, a lower rate of interest payment by the city than called for by the old bonds. It is charged that the issuance of $20,433,000 of new city bonds and $1,686,000 of new water bonds by private contract, without advertisement and competitive bidding was in violation of the "Local Bond Laws" of the State of New Jersey, R. S. 40:1–43. In answer, it is said that the resolution of June 2d, 1944, was properly adopted in accordance with the provisions of R. S. 40:1–61, et seq., relating to refunding bond issues and R. S. App. A:4–13, et seq., relating to the refunding of outstanding water system indebtednesses. Further, it is said that the action complained of has the full and unqualified approval of the Local Government Board sitting as the State Refunding Commission. My examination of the proceedings before the Local Government Board reveals that at a meeting held on August 4th, 1944, attended by the representatives of Stifel, Nicolaus & Co., Inc., and the city solicitor, but not by any of the city commissioners, nor the city comptroller, it was stated "that this Commission does not pass upon the legality of the proceedings taken or to be taken by the municipality in connection with the proposed plan and ordinance, such consent and approval being based solely on the probable capacity to pay and the equitable distribution of debt service charges." In my opinion this qualified statement of the Local Government Board might well be said to raise considerable speculation with respect to the propriety and the manner and method adopted by the governing body in adopting the refunding

program in question. Furthermore, the question of the so-called "service contract," which is apparently a part of the transaction, is condemned by *R. S.* 40:1–58d. Palpably there appears to be considerable merit to the applicants' contention that an investigation should be ordered of this phase of the governing body's actions. *R. S.* 40:1–43 specifically provides that all bonds issued under that article shall be sold at public sale. It is contended by the governing body that the statute is not applicable to refunding issues. I am not called upon to decide that issue here. Under all the circumstances an investigation of the transaction is clearly warranted.

The remaining allegations of misconduct on the part of the municipal officials are specifically set forth at length in the application and, among them, are several which might well justify an investigation. For the purpose of this determination, however, those hereinbefore specifically mentioned are sufficient.

The statute upon which the applicants ground their application reads as follows, *inter alia:*

"40:6–1. Application to supreme court justice; procedure.

"If twenty-five freeholders in any municipality or county shall present to any justice of the supreme court an affidavit, sworn to and subscribed by them, setting forth that they are freeholders and have paid taxes on real estate within one year, and that they have cause to believe that the moneys of such municipality or county, are being, or have been unlawfully or corruptly expended, or, if the board of chosen freeholders of any county, or the legislative body of such municipality, by resolution, shall request such justice to investigate the affairs of the municipality or county making such request, such justice may, in his discretion, make a summary investigation into the affairs of such county or municipality. He may, at his discretion, appoint experts to prosecute such investigation, and may cause the results thereof to be published in such manner as he may deem proper."

It will thus be seen that the application, if properly made, rests a Justice of the Supreme Court with jurisdiction *in his discretion,* to make a summary investigation of the affairs, including unlawful or corrupt expenditures, of the munici-

pality or county. Under the statute and cases, the court is called upon to make such preliminary summary inquiry to determine *only* whether the sworn facts as presented by the applicants establish the statutory jurisdictional requirement that the applicants have *cause to believe* that the moneys of the municipality have and are being unlawfully or corruptly expended. Such expenditures need not necessarily be corrupt; it is sufficient if they be unlawful.

"What the statute is principally aimed at is corruption in public office; and this is not confined to improper and illegal expenditure, but is protean in the forms that it may take. In our decisions it is uniformly treated as a beneficial act. The word 'affairs' is of broad significance, and I am unwilling to limit it to the jurisdictional condition. I regard the act as remedial, and entitled to liberal construction." *In re Newark,* 118 *N. J. L.* 533; 190 *Atl. Rep.* 306, opinion by Mr. Justice Parker, citing *Park Ridge* v. *Reynolds,* 73 *N. J. L.* 116, opinion by Mr. Justice Garrison.

The court is not called upon to determine the facts of the issue. It is sufficient if the sworn facts advanced by the applicants establish the statutory jurisdictional requirement that the applicants had *cause to believe* that the moneys of the municipality have been or are being unlawfully or corruptly expended. *In re Newark, supra* (at *p.* 535), where Mr. Justice Parker commented, that:

"It will be observed, first, that under the New York statute the affidavit is required to contain a statement not only that the freeholders have reason to believe, &c., but also the grounds of their belief; but our act authorizes an order based simply on the affidavit of the freeholders that they have cause to believe, &c., and there does not seem to be any particular provision as to what shall be done in case the unlawful practices are brought to light."

The investigation provided for by the statute is solely an investigation. It is not an accusation nor does it carry an imputation of wrongdoing, nor does it take the place of an indictment by the grand jury. Should perchance the investigation develop evidence of wrongdoing, grand jury action would have to follow before anyone could be brought to trial

therefor. See *City of Hoboken et al.* v. *O'Neill et al.,* 74 *N. J. L.* 57; 64 *Atl. Rep.* 981.

Counsel for the city has urged as a reason for a dismissal of the application the fact that many of the charges advanced by the applicants have been brought after the lapse of a number of years after the date of their alleged commission, and reason therefrom that applicants are in laches. This contention is of no avail. It is predicated on the incorrect assumption that the inquiry is limited to matters to be prosecuted under the criminal law. Neither by statutes nor the decisions is it so limited. *In re Newark,* 119 *N. J. L.* 221; 194 *Atl. Rep.* 620, opinion by Mr. Justice Parker.

A fair consideration of the charges advanced by the applicants and the denial thereof in the answering affidavits, persuades me that the ends of justice will best be served by a summary investigation into the affairs of the City of Atlantic City as requested by applicants.

It is discretionary with the justice, if he deems it advisable, to require the applicants to furnish a bond to be filed with the county clerk in such sum as he may deem necessary for the payment of costs and expenditures of the investigation. This provision is obviously so worded that the bond shall not be in an amount so large that its exaction would prohibit the applicants from furnishing it. I am sure it will not be disputed that the applicants are taxpayers of moderate means and it is reasonable to assume that it would be financially impossible for them to furnish a bond in a substantial amount. To insist upon their furnishing a large bond would obviously result in defeating the investigation in question and the useful purposes of the statute would be nullified. In my opinion the statute did not contemplate the insistment that a large bond be required in such a situation. The applicants will, therefore, be required to furnish a bond in the sum of $5,000 to secure the payment of costs and expenditures of the investigation.

An appropriate order may be submitted to give effect to the foregoing conclusions.